729 F.Supp. 266 (1990)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
v.
STATE OF NEW YORK, N.Y.S. Office of Court Administration, N.Y. Administrative Board of Courts, and N.Y.S. Department of Audit and Control, Defendants.
No. 89 CV 7159 (KMW).
United States District Court, S.D. New York.
January 12, 1990.
*267 James L. Lee, Ann Thacher Anderson, Louis Graziano, E.E.O.C., New York City, for plaintiff.
Michael Colodner, Kenneth Falk, Office of Court Admin., New York City, for Office of Court Admin.
Caren S. Brutten, Asst. Atty. Gen., Robert Abrams, Atty. Gen., New York City, for State of N.Y.

OPINION AND ORDER
KIMBA M. WOOD, District Judge.
This case presents the question whether New York State's refusal to consider judges over age seventy-six for service as "certificated" judges constitutes age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621, et seq. Plaintiff moved for a preliminary injunction enjoining the defendants from refusing to consider a seventy-six year old judge, the Hon. Isaac Rubin, for recertification. Defendants moved for judgment on the merits. Pursuant to Fed.R.Civ.P. 65(a)(2), and with the consent of the parties, the Court consolidated the hearing on this motion with trial *268 on the merits. For the reasons set forth below, the Court on December 22, 1989 permanently enjoined defendants from using age seventy-six as an automatic cut-off point to disqualify Justice Rubin from being considered for discretionary reappointment as a certificated retired justice.

BACKGROUND
Plaintiff EEOC is an agency of the federal government charged with the administration, interpretation, and enforcement of, among other laws, the ADEA. Defendants are agencies and instrumentalities of the State of New York that supervise the administration of the New York State courts.
The New York State Constitution provides for mandatory retirement of supreme court justices at age seventy:
Each ... justice of the supreme court ... shall retire on the last day of December in the year in which he reaches the age of seventy.
N.Y. Const. art. VI, § 25(b).
However, a justice who so retires may thereafter serve as a supreme court justice (1) if he is certificated to serve, (2) for a term of two years which may be extended for additional terms of two years each, and (3) for no longer than the last day of the year in which he reaches age seventy-six:
Each such former ... justice of the supreme court may thereafter perform the duties of a justice of the supreme court, with power to hear and determine actions and proceedings, provided, however, that it shall be certificated in the manner provided by law that the services of such ... justice are necessary to expedite the business of the court and that he is mentally and physically able and competent to perform the full duties of such office. Any such certification shall be valid for a term of two years and may be extended as provided by law for additional terms of two years. A retired ... justice shall serve no longer than until the last day of December in the year in which he reaches the age of seventy-six.
Id. Section 115(2) of the New York State Judiciary Law describes the procedure for certification:
1. Any justice of the supreme court, retired pursuant to subdivision b of section twenty-five of article six of the constitution, may, upon his application, be certified by the administrative board for service as a retired justice of the supreme court upon findings (a) that he has the mental and physical capacity to perform the duties of such office and (b) that his services are necessary to expedite the business of the supreme court.
. . . . .
2. Any such certification shall be valid for a term of two years beginning on the date of filing the certificate. At the expiration of such term the retired justice may be certified for additional terms of two years each by the administrative board upon findings of continued mental and physical capacity and need for his services. No retired justice may serve under any such certification beyond the last day in December in the year in which he reaches the age of seventy-six.
N.Y.Jud.Law § 115 (McKinney 1983). The New York State Constitution also provides for the assignment of retired justices:
A retired ... justice shall be subject to assignment by the appellate division of the supreme court of his residence. Any retired justice of the supreme court who had been designated and served as a justice of any appellate division immediately preceding his reaching the age of seventy shall be eligible for designation by the governor as a temporary or additional justice of the appellate division. A retired ... justice shall not be counted in determining the number of justices in a judicial district for purposes of section six subdivision d of this article.
N.Y. Const. art. VI, § 25(b).
The certification process normally begins in January or February of the year before each term of certification is to begin, when the Administrative Board mails a letter to eligible justices inviting them to apply for certification. Affidavit of Matthew T. Crosson, December 13, 1989 ("Crosson Aff."), at ¶ 6. The Administrative Board makes arrangements for applicants to undergo *269 medical and psychological examinations in the early spring, and the Board receives reports regarding applicants from other judges with administrative duties, as well as from bar associations and other interested individuals. Crosson Aff. at ¶ 8. In June, the Administrative Board, consisting of the Chief Judge of the Court of Appeals and the Presiding Justices of each of the four Appellate Divisions, meets to determine, in its discretion, which justices will be certificated. The Board considers the factors set forth in the Judiciary Law, including nature and extent of the applicant's prior judicial service. Crosson Aff. at ¶ 10. The Administrative Board's discretion in determining whether to certificate an applicant is broad and nearly unfettered. The Administrative Board can, and does, refuse to certify a judge for any reason it deems sufficient, including fiscal reasons. A judge who is not selected for certification has no right to a hearing, and no right even to a statement of reasons for the denial. Applicants are usually informed of the Board's determination in June.[1]

FACTS
Justice Rubin was born on May 19, 1913. On November 2, 1976, he was elected to a fourteen year term as a Justice of the New York State Supreme Court, commencing January 1, 1977. Effective January 1, 1982, Justice Rubin was designated by then Governor Carey to serve as an Associate Justice of the Appellate Division, Second Department. While serving in that capacity, in 1983, Justice Rubin reached the age of seventy. As required by the judicial retirement provisions of the New York State Constitution and the New York State Judiciary Law, Justice Rubin retired on December 31, 1983. Pursuant to N.Y. Const. art. VI, § 25(b), the remaining seven years of Justice Rubin's fourteen year elected term expired at that time.
In 1983, Justice Rubin applied for and received certification; effective January 1, 1984, Justice Rubin began his first two-year term as a certificated justice. Concurrently with Justice Rubin's certification, Governor Cuomo redesignated Justice Rubin as an additional Justice of the Appellate Division, Second Judicial Department. Effective January 1, 1986, and January 1, 1988, respectively, the Administrative Board certificated Justice Rubin for service as a retired justice for second and third two-year terms, and Governor Cuomo each time redesignated him as an additional Justice of the Appellate Division, Second Judicial Department.
On May 9, 1989, Justice Rubin reached the age of seventy-six. Because he reached age seventy-six, Justice Rubin was ineligible for any additional certificated term, or for redesignation to the Appellate Division, pursuant to the sections of the New York State Constitution and the Judiciary Law cited above. Justice Rubin was thus not permitted to apply for, nor was he considered for, further certification by the Administrative Board. Crosson Aff. at ¶ 11.
On October 30, 1989, the EEOC filed this action on behalf of Justice Rubin. Concurrently, the EEOC began negotiations with defendants on Justice Rubin's behalf in which the EEOC specifically requested that Justice Rubin be allowed to participate in the preliminary steps of the certification process immediately so that, if plaintiff were successful in this lawsuit, Justice Rubin would be able to maintain his seat after December 31, 1989. Tr. at 19-20. Until the hearing on plaintiff's motion on December 21, 1989, defendants would not agree to allow Justice Rubin to take the required medical examinations, nor would they agree to take any other steps necessary to begin the certification process. Id. at 19-20, 26.
As of the date of the hearing on this motion, Justice Rubin had not gone through any of the steps of the certification process. Justice Rubin had, however, requested that the Governor consider him *270 for redesignation to the Appellate Division, subject to a favorable determination in this lawsuit. Justice Rubin was advised that on November 17, 1989, the Governor's State-wide Screening Panel for the Second Judicial Department approved his name as qualified for redesignation to the Appellate Division by Governor Cuomo. Affidavit of Isaac Rubin, November 29, 1989 ("Rubin Aff."), at ¶ 32. Justice Rubin testified that he has been advised that the Administrative Board is willing to process his certification much more expeditiously than is usual if the ADEA is held to apply to certificated justices. Tr. at 17, 48.

DISCUSSION
The ADEA, 29 U.S.C. § 623, provides:
It shall be unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of his age.
As amended in 1974, the definition of "employer" in the ADEA includes states, political subdivisions, and state agencies. See 29 U.S.C. § 630(b). Although the ADEA originally protected only employees under seventy years of age, Congress deleted the age ceiling effective January 1, 1987. See 29 U.S.C. § 631(a).
The ADEA enumerates four exceptions to the definition of employees covered under the Act:
The term "employee" means an individual employed by any employer except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policymaking level or an immediate advisor with respect to the exercise of the constitutional or legal powers of the office.
29 U.S.C. § 630(f).
This case is unusual in that there is far more agreement among the parties here than there has been among parties to similar litigation in other states. Unlike the State of Vermont,[2] New York takes the position that judges are not "on the policymaking level" and thus do not fall within that exception to the ADEA's application.[3] Unlike the Commonwealth of Massachusetts,[4] New York takes the position that appointed state court judges are protected from age discrimination by the ADEA, which New York views as superseding the state constitution's requirement that all judges retire at age seventy. See fn. 3, supra. The only point of disagreement in this case is whether certificated justices *271 should be categorized as "elected to public office" for purposes of the ADEA.
Plaintiff asserts that because Justice Rubin's elective office terminated upon his retirement after reaching age seventy, and because it was the Administrative Board, rather than the voters, who made the decision to select him for certification, he is outside the "elected" official exception to the ADEA; in plaintiff's view, having served in the past as an elected judge is merely one prerequisite to certification. Defendants assert that elected status is "inseparable" from certificated status: a certificated judge must have been an elected supreme court justice prior to his certification, and he "continue(s) to hold the office of Supreme Court Justice to which he or she was elected, and was now `retired,'"[5] with the same duties.
Defendants, however, are answering the wrong question. The question is not whether an elected judge's job title and duties continue unchanged after his retirement and certification, but whether his status as an elected judge remains unchanged.[6]
To answer this question, the Court is required to construe the phrase "elected to public office" as it is used in the ADEA. The wording of the exemption "any person elected to public office in any state or political subdivision of any state" given its ordinary meaning, appears to apply to any person who holds his present office because the voters elected him to it, rather than, as defendants contend, to any person whose voter-elected term has ended, and who now holds office by virtue of having been selected by someone other than the voters. Thus, the wording of the exemption suggests that certificated judges should not be included in the category of "elected" officials.
Furthermore, neither the remainder of the statute nor the legislative history lends any support for defendants' position.[7]
No other portion of the ADEA lends any assistance in defining "elected" or in explaining why elected officials were singled out for exclusion. The principle noscitur a sociis ("it is known from its associates"), which is often resorted to when interpreting one of several exceptions, is not helpful here. Although there may be a common thread among the other three exceptions (i.e., each exception excludes certain appointed officials), the elected official exemption is intuitively distinctive: the application of the ADEA to elected officials could have the absurd result of requiring a court to inquire into each voter's motives in voting, and could deprive the electorate of the representative it chose.[8]
*272 The legislative history of the ADEA is of no help on either the meaning of the word "elected" or the purpose of the elected official exemption; there is no mention of it in any report or any debate leading up to the ADEA's enactment.[9]See E.E.O.C. v. Massachusetts, 858 F.2d at 58. However, the exemption for certain government officials contained in the ADEA was taken in haec verba from the exemptions from the definition of "employee" under Title VII of the Civil Rights Act of 1964 ("Title VII"). See 42 U.S.C. § 2000e(f). Thus, in interpreting the elected official exemption of the ADEA, the Court will look to the relevant legislative history of Title VII, as all parties have urged the court to do. See E.E.O.C. v. Massachusetts, 858 F.2d at 55.
In 1972, Congress broadened the reach of Title VII to include state and local governments as employers. The elected official exemption was introduced on the floor of the Senate, after the bill was reported out of the Senate Committee; it is thus not mentioned in the Senate Committee Report, nor is it mentioned in the House Committee Report. It is mentioned in the Conference Report, which states only "i[t] is the intention of the conferees to exempt elected state officials...." H.R. Conf.Rep. No. 899, 92nd Cong., 2d Sess., Joint Explanatory Statement of the Managers at the Conference on H.R. 1746 ("Conference Report"), reprinted in 1972 U.S. Code Cong. & Adm.News 2137, 2180. It is also mentioned in the Section-by-Section analysis of the bill as reported from the conference, which was prepared by Senators Williams and Javits, which states only "[t]his subsection is intended to exclude from the definition of `Employee' as used in Title VII those persons elected to public office in any state or political subdivision." 118 Cong.Rec. 7167 (1972).
The only discussion of the elected official exemption in the legislative history appears during debate on the Senate floor on January 31, and February 16 and 17, 1972.[10] On January 31, Senator Ervin, an opponent of the legislation, posed the question whether the bill covered elected officials. 118 Cong.Rec. at 1838. Senator Taft, a member of the committee that drafted the bill, responded "[t]he selection process there is by the voters of the State. I do not believe there is any inference in the legislation proposed which would include elected officers," and a few minutes later said "although there is no specific language to that effect, as to whether there is any intent to cover them, ... there is in fact no intent to cover elected officials." Id. Senator Taft then said that if Senator Ervin were to propose an amendment making explicit the exclusion, Senator Taft would support it. Id.
On February 16, Senator Ervin proposed an amendment to exclude "any person *273 elected to public office in any state or political subdivision of any state by the qualified voters thereof...." Id. at 4095.[11] He stated:
Mr. President, I really think that makes a bad bill a little less obnoxious, because I do not think the author of the bill ever intended to cover elected officials, those elected by the qualified voters. However, I fear that they have covered them by the breadth of the language.
Id. at 4097. He further stated that the purpose of the amendment was to avoid empowering a federal judge to remove
[a] Governor ... or other elected official of a State or county from office, if that federal judge finds that the voters of that State elected that Governor because they preferred a man of his race or a man of his religion or a man of his national origin or a person of his sex, rather than a person of some other race or religion or national origin or sex.
Id. at 4485.
A few minutes later, Senator Williams, the manager of the bill in the Senate, supported the proposed exemption of elected officials, stating:
I certainly subscribe, and for many reasons, to the exclusion of the elected official at the State and local governing level. His test comes at the polls rather than under a law of this nature. I think that is certainly sufficient test as to propriety in the undertaking of his office, in view of the people that have the opportunity to select him for elected office. For another reason, I would think he should not be in a position to have unwarranted and irresponsible charges made against him. Again, his test would be at the polls.
Id. at 4492.
No other Senator spoke during the debate on the elected official exemption except Senator Javits, who said he believed that elected officials were not encompassed by the bill as originally proposed, but who had no quarrel with making the exemption explicit. Id. at 4097. Senators Williams, Javits and Ervin all voted in favor of the Ervin amendment. Id. at 4494.
The legislative history contains no discussion of the meaning of the word "elected."[12] The only clues to its meaning are in the statements of the rationale for the elected official exemption, cited above, i.e., Senator Ervin's intention to preclude federal courts from examining the voters' motivations in voting and to preclude federal courts from overriding the voters' choice of elected officials, and Senator Williams' statement that an elected official's "test comes at the polls rather than under a law of this nature."
The legislative history of the other exemptions adopted along with the elected official exemption does not shed light on the meaning of the word "elected."[13]
*274 The only legislative history on point thus suggests that the words "elected to public office" refer to someone who holds his present office because the voters elected him to it. It also suggests that if a position is claimed to have both elective and appointive aspects, it should be categorized as "elective" only if an inquiry into whether discrimination motivated the choice would require probing the motives of the electorate, and only if a finding of discrimination would result in the ouster of someone chosen for the position by the electorate. Defendants' argument that Justice Rubin should be categorized as "elected" because his job title and duties are the same after certification as they were before certification ignores the only rationales for the elected official exemption found in the legislative history, and must be rejected.
An inquiry into whether a justice was denied certification because he was discriminated against would entail an examination of the motives of the Administrative Board members who made the certification decision, not the motives of voters who elected him to office years before.[14] The electorate has no voice at all in the certification process.[15] In evaluating an application for certification, the Administrative Board carefully reviews each applicant's then-current physical and mental fitness, the views of members of the bar regarding the applicant's experience and abilities, and less personal criteria such as fiscal constraints. As defendants state:
Applicants eligible for certification are screened by medical examinations to determine their physical and mental capacity to continue performing their duties as a Supreme Court Justice; bar associations and other groups and individuals are consulted for their views of the applicant's experience and abilities; and District Administrative Judges provide reports *275 evaluating applicants and the need for their continued judicial service.
Defendants' Memorandum of Law at 4. Defendants acknowledge that the Administrative Board then exercises broad discretion in making its decision:
Pursuant to section 115 of the Judiciary Law, the Administrative Board then exercises its discretion in selecting Justices for certification, based upon the standards set forth in the statute, as well as other criteria that may be considered by the Board (e.g., the nature and extent of prior judicial service, judicial competency, fiscal impact, etc.)
Crosson Aff. at ¶ 10.[16] Justice Rubin's testimony at the hearing confirmed the broad, unchecked discretion of the Administrative Board to decline to certify an applicant for virtually any reason. Tr. at 17, 46. See also, Marro v. Bartlett, 46 N.Y.2d at 681, 416 N.Y.S.2d 212, 389 N.E.2d 808 (Administrative Board has "nearly unfettered" discretion in certification determination).[17]
Given that only the motives of Administrative Board members, not those of the electorate, would be scrutinized in an inquiry into whether denial of certification violated the ADEA, Congressional intent in creating the elected official exception is best followed by declining to categorize certificated Supreme Court Justices as elected officials.
This conclusion is bolstered by the Title VII conferees' explicit instruction to construe its exceptions "narrowly." In referring to all the exceptions that became codified in 42 U.S.C. § 2000e(f), the Congressional conferees stated: "It is the conferees [sic] intent that this exemption shall be construed narrowly." Conference Report, 1972 U.S.Code Cong. & Ad.News at 2179-80. The Section-By-Section Analysis of the bill as reported out of the Conference, which was prepared by Senators Javits and Williams, states that this exemption is "to be construed very narrowly." 118 Cong. Rec. at 7167.
Defendants point out that this Court's interpretation of the word "elected" to exclude certificated judges is at odds with a decision of the New York Court of Appeals, and contend that this Court must follow the New York court's decision. In that decision, Diamond v. Cuomo, 70 N.Y.2d 338, 530 N.Y.S.2d 732, 514 N.E.2d 1356 (1987), appeal dismissed, 486 U.S. 1028, 108 S.Ct. 2008, 100 L.Ed.2d 597 (1988), the New York Court of Appeals declined to overrule the Administrative Board's determination that certificated justices should be *276 viewed as "elected" as that term is used in the ADEA.[18]
It is well settled that, absent any clear indication to the contrary from Congress, the meaning of words in a federal statute is a question of federal law. Western Airlines v. Board of Equalization of So. Dakota, 480 U.S. 123, 107 S.Ct. 1038, 94 L.Ed.2d 112 (1987) (whether a state tax is an "in lieu tax which is wholly utilized for airport and aeronautical purposes," as those words are used in the federal Airport and Airway Improvement Act of 1982, is a question of federal law); Popkin v. N.Y. State Health and Mental Hygiene Facilities Improvement Corp., 547 F.2d 18, 19 (2d Cir.1976), cert. denied, 432 U.S. 906, 97 S.Ct. 2950, 53 L.Ed.2d 1078 (1977) (whether state agency is an "employer" under Title VII of Civil Rights Act is a question of federal law; "Congressional intent concerning the coverage of Title VII and the actual nature of appellee's relationship to the state determine whether or not the corporation was covered by Title VII before 1972").
Decisions construing analogous terms of Title VII of the Civil Rights Act suggest that the determination of which state employees are protected by federal antidiscrimination laws is a particularly appropriate area for a uniform federal rule that is independent of state law. In Calderon v. Martin County, 639 F.2d 271 (5th Cir.1981), the Fifth Circuit decided that whether a Florida deputy sheriff is an "employee" of a state or political subdivision of a state is a matter of federal law; the Fifth Circuit reversed the decision of the district court, which had followed Florida law in categorizing deputy sheriffs as "appointees" rather than "employees." The Fifth Circuit stated:
Congress amended Title VII specifically to bring "governments, governmental agencies, [and] political subdivisions" under the Act's requirements. It would defeat the purpose of the amendment to allow the state governments themselves to designate which of their workers will receive Title VII protection. In addition, having each state determine when Title VII will apply would create an unmanageable lack of uniformity in the application of the Title VII provisions.
Id. at 272 (citations omitted); see also Teneyuca v. Bexar County, 767 F.2d 148, 150 (5th Cir.1985) (whether an assistant district attorney is a member of an elected official's personal staff and thus excepted from Title VII definition of "employee" is a matter of federal law); Curl v. Reavis, 740 F.2d 1323, 1327 (4th Cir.1984) (same holding re. deputy sheriff); Owens v. Rush, 654 F.2d 1370, 1375 (10th Cir.1981) (same holding re. undersheriff).
Defendants next argue that the United States Supreme Court adopted the view that a certificated judge in New York should be categorized as "elected" for ADEA purposes, when it summarily dismissed the appeal from the decision in Diamond v. Cuomo for want of a substantial federal question, and that this Court is bound by the Supreme Court's decision.
Defendants are correct in stating that summary actions by the United States Supreme Court are considered "on the merits" and thus are binding upon lower *277 courts. See Hicks v. Miranda, 422 U.S. 332, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975). However, in Mandel v. Bradley, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977), the Court emphasized that, due to the absence of any opinion by the Supreme Court in summary actions, lower courts need to ascertain the "reach and content" of such actions in order to determine their precedential effect. Id. The Court also stated:
Because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below. "When we summarily affirm, without opinion, ... we affirm the judgment but not necessarily the reasoning by which it was reached."
Id. (quoting Fusari v. Steinberg, 419 U.S. 379, 391, 95 S.Ct. 533, 541, 42 L.Ed.2d 521 (1975) (Burger, C.J., concurring)). The Court went on to indicate that it is the Statement of Jurisdiction that one looks to to determine what specific challenge was rejected for want of a substantial federal question:
Summary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction....
Id. 432 U.S. at 176, 97 S.Ct. at 2240. See also League of Women Voters v. Nassau County Board of Supervisors, 737 F.2d 155 (2d Cir.1984), cert. denied, 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778 (1985).
An examination of the per curiam opinion of the New York Court of Appeals, in Diamond, as well as the Jurisdictional Statement filed in the United States Supreme Court, reveal that the summary dismissal by the United States Supreme Court is not binding precedent on the question of whether a certificated justice should be categorized as "elected" for purposes of the ADEA. As discussed above, the plaintiffs in Diamond were asserting an equal protection challenge to the action of the Administrative Board. Their Jurisdictional Statement makes clear that the only question before the United States Supreme Court was whether the ADEA's distinction between elected and appointed judges violates the Equal Protection Clause:
Appellants brought these proceedings upon the sole theory that the Administrative Board's application of the New York State mandatory retirement provisions as interpreted under the provisions of the ADEA, violates their rights to equal protection of the laws under the United States Constitution. Specifically, it is appellants' position: that there is no rational basis for distinguishing between elected judges and appointed judges who reach the age of 70 ...
Appellants' Jur.St. (No. A-513) at 9, Diamond v. Cuomo, appeal dismissed, 108 S.Ct. 2008. Indeed, the Jurisdictional Statement in Diamond does not even mention the issue of whether a certificated justice is properly considered an elected official for ADEA purposes.
If the question whether certificated judges are elected officials for ADEA purposes were "fairly included" within the question posed in the Jurisdictional Statement, the summary dismissal of plaintiffs' appeal would be binding precedent on both issues. See Sup.Ct.R. 15.1(a). But in order to decide that the challenge to the ADEA's distinction between elected and appointed officials does not pose a substantial federal question, it is not necessary to decide whether certificated judges should be categorized as elected or appointed. Compare Hatten v. Rains, 854 F.2d 687 (5th Cir. 1988), cert. denied, ___ U.S. ___, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989) (dismissing equal protection challenge to mandatory retirement for judges in part due to summary action of Supreme Court in Diamond). The United States Supreme Court's summary dismissal of plaintiffs' appeal in Diamond is thus not binding precedent on the question whether certificated judges should be categorized as elected judges.
Defendants argue next that the will of the electorate is being foiled if judges can serve beyond age seventy-six  i.e., voters might not have elected someone older than fifty-six to a fourteen year term if they had *278 known that after his retirement he could be certificated to serve beyond age seventy-six. Defendants have offered no evidentiary support for their speculative proposition that, in electing particular judges, voters look as much as twenty years down the road (or even as few as seven years down the road) and consider whether the judge will be certificated, and, if so, for how long. It is equally plausible that the voters repose their trust in the Administrative Board's exercise of its discretion to certificate only well qualified judges, and that voters do not attempt, when casting their ballots, either to predict how fit a judge will be as much as twenty years later, or to predict whether, if he is unfit at an advanced age, he will nonetheless be certificated.
Finally, defendants argue that to permit Justice Rubin to serve more than six years as a certificated justice creates a longer term of office than exists under state law, the creation of which would violate principles of federalism.[19] Defendants' argument rests on the implication that New York law limits the service of certificated justices to six years, independent of the age limitation. However, no such independent limitation exists. Neither the New York State Constitution nor the New York Judiciary Law imposes any limit on the number of terms for which a justice may be certificated; the only limit they impose is an age limit.[20] In effect, defendants are asking this court to rewrite the New York State Constitution and Judiciary Law, substituting a time limitation for the impermissible age limitation. This the court cannot do. As defendants themselves point out, "[a] Federal Court cannot create a State term of office where none exists under State law." Defendants' Memorandum of Law at 17.
Defendants' claim that this Court's holding would in effect be granting lifetime tenure to elected supreme court justices is simply wrong. See fn. 16, supra. Certificated judges will merely be eligible to be recertificated by the Administrative Board for successive two year terms, without being automatically disqualified because of their age.

CONCLUSION
Accordingly, defendants' motion for summary judgment is denied, and judgment for plaintiff is granted. Defendants are permanently enjoined from enforcing any provision of the New York State Constitution and laws that would operate to disqualify Justice Rubin from applying for certification as a certificated retired justice of the New York State Supreme Court, and from serving in that position if he is certificated, due solely to the fact that he has reached the age of seventy-six.
SO ORDERED.
NOTES
[1] Justice Rubin contends that the Administrative Board can short-cut these procedures, and that he has been informed that the Administrative Board is willing to short-cut them in his case. Transcript of December 21, 1989 Hearing ("Tr.") at 7, 11-12, 17, 19, 31-32.
[2] See E.E.O.C. v. State of Vermont Office of Court Administration, 717 F.Supp. 261 (D.Vt. 1989). Because defendants here do not rely on the "policymaking level" exception, defendants agreed that there was no reason for this Court to await the resolution of the appeal in the Vermont case. Tr. at 39-43.
[3] In 1987, the New York State Administrative Board noted that Congress had amended the ADEA to remove the seventy-year ceiling for the protected age group, and the Administrative Board informed all New York State judges of the Board's interpretation of the effects of the amendment in a memorandum dated May 26, 1987. Rubin Aff., Exh. 1. In the memorandum, the Administrative Board stated that because appointed judges are not "high policymakers" and do not fall within any of the other enumerated exceptions to the Act, the ADEA, by its terms, applies to New York State's appointed judges. Noting that the ADEA provisions conflict with the state requirement that most judges retire on the last day of the year in which they reach seventy, the Administrative Board concluded that the ADEA prevails over the state mandatory retirement provisions. The Administrative Board thus advised appointed judges that they may remain in office after the age of seventy. The memorandum noted that because the ADEA excepts elected officials from its application, elected officials were still subject to the state mandatory retirement provisions. The Administrative Board then considered how to characterize a retired supreme court justice, who has been certificated to serve past age seventy. Without elaboration, the Administrative Board memorandum stated that "it is the conclusion of the Administrative Board that certificated Supreme Court justices are elected judges for purposes of the ADEA...." Rubin Aff., Exh. 1.
[4] See E.E.O.C. v. Massachusetts, 858 F.2d 52 (1st Cir.1988).
[5] Memorandum of Law on Behalf of Defendants ("Defendants' Memorandum of Law") at 8.
[6] In addition, the Court notes that defendants' argument is inconsistent with the New York Court of Appeals' characterization of certification not as a continuation of prior judicial service, but rather as a termination of the previous judicial status ("a complete break") and the beginning of a new status:

First comes the mandate that each Justice of the Supreme Court shall retire on the last day of December in the year in which he reaches the age of 70. At that time his entitlement to serve as a Justice terminates irrespective of other considerations, and he becomes a "former justice." Absent some further constitutional authorization he would be ineligible to serve as a Judge. Such further authorization, however, is found in the provision  "Each such former * * * justice * * * may thereafter perform the duties of a justice of the supreme court * * * provided, however, that it shall be certified", etc. We interpret the verb, "may", as a term of enablement but not of entitlement. Rather than connoting some form of continuation of prior judicial service, the Constitution recognizes a complete break  termination of the previous judicial status, and the inauguration by the required certification of a new judicial designation.
Marro v. Bartlett, 46 N.Y.2d 674, 680, 416 N.Y. S.2d 212, 389 N.E.2d 808 (1979) (emphasis added).
[7] Defendants have the burden of establishing that the exemption applies. "One who claims the benefit of an exception from the prohibition of a statute has the burden of proving that his claim comes within the exception." Sutherland, Statutes and Statutory Construction § 47.11 (4th Ed.1984).
[8] The legislative history confirms that it was these voter-related concerns that prompted introduction of, and support for, the elected official exemption. See pp. 272-274, infra.
[9] The ADEA was expanded to cover state employees as part of the Fair Labor Standards Act Amendments of 1974. The Senate and House committee reports state only that the ADEA was extended and the reasons therefor, with no discussion of the exceptions. See Report of the Committee on Education and Labor of the House of Representatives, H.R.Rep. No. 913, 93rd Cong., 2d Sess. (1974); Report of the Committee on Labor and Public Welfare of the United States Senate, S.Rep. No. 690, 93rd Cong., 2d Sess. (1974). There was no debate on the floor of the House or Senate concerning the exceptions. See 120 Cong.Rec. at 5695-5749 (Mar. 7, 1974, Senate), 7304-7349 (Mar. 20, 1974, House), 7519-7524 (Mar. 20, 1974, Senate), 8596-8606 (Mar. 28, 1974, House), 8759-8770 (Mar. 28, 1974, Senate).
[10] Although the remarks of individual members during debates are often accorded little or no weight, the same is not true of the remarks of sponsors and drafters of legislation. Remarks by the floor manager of a bill (here, Senator Williams) are entitled to "substantial weight." Mills v. U.S., 713 F.2d 1249, 1253 (7th Cir.1983), cert. denied, 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984). The views of draftsmen (here, Senator Ervin drafted the elected official exemption) are given weight when the following conditions are met:

[when] the draftsman's views were clearly and prominently communicated to the legislature when the bill was being considered for enactment, so as to give reason to believe that legislators' understanding of the bill would have been influenced by the draftsman's communicated views and so as to be visible to others who are concerned to understand the meaning of the act....
Sutherland, supra, § 48.2. There is no doubt that Senator Ervin communicated his views regarding the purpose of this exemption clearly and prominently in the Senate debate.
[11] The amendment as initially proposed also exempted any person chosen by an elected official to advise him in "the exercise of the constitutional or legal powers of his office." Because Senator Ervin stated a different rationale for the elected official exemption than for the other exemptions (see fn. 13, infra), this discussion of the legislative history is limited to remarks on the elected official exemption.
[12] Not surprisingly, there is no reference in the legislative history to certificated judges.
[13] The only mention of a rationale for the other exemptions found in the legislative history is by Senator Ervin. On February 16 (when the proposed exemption was for "any person chosen by [an elected official] to advise him in respect to the exercise of the constitutional or legal powers of his office"), he stated that an elected official should be able to choose as advisor someone he knows, without restriction, for advice regarding the duties of his office. He gave as an example his County Board of Commissioners' choice of a legal advisor, and stated "I think they ought to be allowed to choose that attorney without any restrictions whatsoever, because a person ought to know who he relies on for advice to the duties of his office." 118 Cong.Rec. at 4097 (emphasis added).

Most of the debate in the Senate concerning Senator Ervin's proposed exclusions centered on what words to use to confine the scope of an exemption for close, personal advisors of elected officials. Senator Javits raised a concern that the wording proposed by Senator Ervin could extend to all 500 employees in a State Attorney General's office, but stated "I realize that the Senator is seeking to confine it to the higher officials in a policymaking or policy advising capacity." Id. The next day, Senator Ervin stated that he was accepting a suggestion by Senator Javits, and changed the wording of his proposed amendment to include a person chosen by elected officials as "a personal assistant or an immediate adviser in respect to the exercise of the constitutional or legal powers of the office." Id. at 4493. Senator Williams asked whether the purpose of the amendment was to exempt those "who are his first line of advisors" and "who are in a close personal relationship and an immediate relationship with him." Id. at 4492-93. Senator Ervin responded "I would say to my good friend from New Jersey that that is the purpose of the amendment." Id. at 4493. Responding to Senator Williams' question whether those who are in a Governor's cabinet would be included in the "personal assistant" category, Senator Ervin stated:
That is what is intended by this amendment, plus his legal advisers, because no Governor can get along and discharge the many duties imposed upon him by his office without having someone to lean on for advice, counsel, and so forth.
Id. The Senate adopted the amendment in this form.
Senator Ervin voted against the bill itself, after delivering a ringing, thirty-minute denunciation of federal interference with states' abilities to select their employees unfettered by anti-discrimination laws. Id. at 4483-84.
No light is shed on the meaning of "elected" by the later addition of an exemption for "an appointee on the policymaking level," which was adopted for the first time at the House-Senate Conference. The only statement explaining this addition is in the conference managers' report:
It is the intention of the conferees to exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisers or to policymaking positions at the highest levels of the departments or agencies of State or local governments, such as cabinet officers, and persons with comparable responsibilities at the local level. It is the conferees' intent that this exemption shall be construed narrowly.
Conference Report, 1972 U.S.Code Cong. & Admin.News at 2179-80.
[14] Defendants' argument might be stronger if certification were a mere formality, extended to every retired justice who applies for it. That it is not a mere formality is evident from defendants' own description of the process and from the New York Court of Appeals decision in Marro v. Bartlett, which interprets the New York State Constitution as permitting justices to be certified, but not entitling them to certification. 46 N.Y.2d at 679, 416 N.Y.S.2d 212, 389 N.E.2d 808. See fn. 17, infra.
[15] This is particularly obvious in the case of retired justices who are certificated even after the expiration of the number of years for which they were elected. For example, a justice can be elected to a fourteen-year term, retire at age seventy at the end of his fourteen-year term, but then be eligible to be certificated and recertificated thereafter, even though all of his certificated terms fall outside the fourteen-year term for which he was elected.
[16] Defendants' argument that construing the ADEA to apply to certificated Supreme Court Justices would automatically give them lifetime tenure is belied by the above-quoted excerpts from their own submissions.
[17] In Marro, the Court of Appeals considered whether the Administrative Board's denial of certification, without a statement of reasons for the denial and without a hearing, denied due process to the applicant. The court noted first that the applicant apparently was physically and mentally qualified for certification, and that the Administrative Board had acknowledged that additional judicial services were necessary:

the Administrative Board has never questioned appellant's mental or physical competence, and ... that it has determined, at least impliedly inasmuch as other applicants were certificated, that additional judicial services are necessary to expedite the business of the Supreme Court in the First Judicial Department. It claims, however, that it may determine in its discretion which applicants to certify to meet the need for additional judicial services, and that its exercise of such discretion is not subject to judicial review.
46 N.Y.2d at 679, 416 N.Y.S.2d 212, 389 N.E.2d 808. After determining that due process rights do not attach to the certification process, the court proceeded to discuss the extent of the Administrative Board's discretion:
The adequate, conscientious discharge of the obligation of the board necessarily demands that it be vested with the very broadest authority for the exercise of responsible judgment....
We therefore conclude that the Administrative Board of the Judicial Conference had very nearly unfettered discretion in determining whether to grant applications of former Judges for certification, a discretion which was not subject to judicial review in the absence of claims of substance that there had been violation of statutory proscription or promotion of a constitutionally impermissible purpose, unrelated to the certification process.
Id. at 681-82, 416 N.Y.S.2d 212, 389 N.E.2d 808 (emphasis added).
[18] In Diamond, a group of supreme court justices, including one certificated supreme court justice, challenged the ADEA's distinction between elected and appointed officials as violative of the Equal Protection Clause of the Fourteenth Amendment as applied to them. In a per curiam opinion, the Court of Appeals held that the ADEA classifications are rationally related to some state interest and thus that treating elected judges differently from appointed judges does not violate the Equal Protection Clause. At the end of its opinion, the court also stated the following with respect to certificated supreme court justices:

One of the plaintiffs is a certificated Supreme Court Justice. The Administrative Board determined that such Justices hold office by reason of their election to the Supreme Court, that they are exempt from the provisions of the federal statute, and that their tenure is limited by Judiciary Law § 115. We find no error with that interpretation and no merit to the claim that such Justices' constitutional rights have been abridged because they have been held elected, not appointed, officers who are exempt from the provisions of the Federal statute.
70 N.Y.2d at 342, 530 N.Y.S.2d 732, 514 N.E.2d 1356.
[19] The court notes that the Administrative Board did not see creation of a longer term of office than exists under state law as impermissible in 1987, when it stated in its opinion on the reach of the ADEA that the recent amendments to the ADEA eliminate any mandatory retirement for appointed judges.
[20] As noted supra at p. 268, the New York State Constitution describes the certification process as follows:

Any such certification shall be valid for a term of two years and may be extended as provided by law for additional terms of two years.
N.Y. Const. art. VI, § 25(b). The New York State Judiciary Law is consistent with the New York State Constitution on this point:
Any such certification shall be valid for a term of two years beginning on the date of filing the certificate. At the expiration of such term the retired justice may be certified for additional terms of two years each by the administrative board upon findings of continued mental and physical capacity and need for his services.
N.Y.Jud.Law § 115(2) (McKinney 1983).